**Leonard SHEPPARD, Jr., Trustee, Appellant,**

v.

**INTERBAY FUNDING, LLC, Appellee.**

No. 01–07–00935–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 27, 2009.

Cory Matthew Krueger, Nelson T. Hensley, Hensley & Krueger, L.L.P., Houston, TX, for Appellant.

John M. Ledyard, Randall L. Telford, Irving, TX, for Appellee.

Panel consists of Justices JENNINGS, BLAND, and HUDSON.*

---

* The Honorable J. Harvey Hudson, retired jus-    tice, Fourteenth Court of Appeals, Houston,

## OPINION

TERRY JENNINGS, Justice.

Appellant, Leonard Sheppard Jr., Trustee, challenges the trial court's rendition of summary judgment in favor of appellee, Interbay Funding, LLC ("Interbay"), in Interbay's suit against Sheppard for declaratory judgment. In two issues, Sheppard contends that the trial court erred in granting Interbay summary judgment on the ground that Interbay was "entitled to an equitable first lien" on a piece of real property and in denying his cross-summary judgment motion. In its sole cross issue, Interbay contends that although the trial court correctly granted it summary judgment on the ground that Interbay held an equitable first lien on the real property, the trial court erred in denying it summary judgment on the ground that Interbay was "contractually subrogated to the first lien position" on the real property.

We modify the judgment of the trial court to delete all uses of the word "equitable" when referring to the first lien held by Interbay on the real property, and, as modified, we affirm the judgment of the trial court.

### Factual and Procedural Background

The critical facts are largely undisputed. On September 25, 2002, Julian Kimble purchased a piece of real property from Lake Olympia Development Corporation. Kimble financed the purchase of this real property with two loans, one from Interbay in the amount of $357,500 (the "Interbay loan") and one from Lake Olympia in the amount of $213,500 (the "Lake Olympia loan"). These loans were evidenced by two separate promissory notes (the "Interbay note" and "Lake Olympia note") exe-

cuted at the closing on September 25, 2002. The amounts owed under these notes were secured by two separate deeds of trust (the "Interbay deed" and "Lake Olympia deed") recorded in the real property records. The Interbay deed provided security for the obligation in the Interbay note as well as "each obligation contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any party of this [Interbay] Note [and] this Security Instrument [Interbay Deed], . . . ." The Lake Olympia deed acknowledged that the lien created by that deed (the "Lake Olympia lien") would be subordinate to the lien created by the Interbay deed (the "Interbay lien") as well as any liens arising from any "renewals, extensions, and modifications" of the Interbay note. Also at closing, Lake Olympia assigned the Lake Olympia note and deed to Property Sales & Management, L.L.C. ("PSM").[1]

On April 28, 2004, Kimble refinanced his Interbay loan (the "Interbay refinanced loan"). Kimble signed a new note (the "Interbay refinanced note") reflecting a new principal amount of $560,000, and Kimble also signed a deed of trust in favor of Interbay (the "Interbay refinanced deed") to secure payment of the refinanced loan, which created a lien (the "Interbay refinanced lien") on the real property. As reflected in the settlement statement executed at the refinancing closing, $407,210.52 of the proceeds from the Interbay refinanced loan were used to pay the outstanding balance of the Interbay note, $107,199.63 of the proceeds were paid directly to Kimble, and the remaining proceeds were used to pay settlement charges, among other things.

Texas, participating by assignment.

1. For convenience, we will still refer to this note and deed, after the assignment to PSM, as the "Lake Olympia note and deed."

After the refinancing, a dispute arose between the parties as to the priority of the Interbay refinanced lien and the Lake Olympia lien. Interbay filed suit against PSM, seeking a declaration that, by refinancing the original Interbay note, it maintained "an equitable first lien on the Real Property in the amount of $407,210.52, which represents the balance of the first lien prior to the refinance." Interbay further contended that it had been equitably subrogated to the rights arising from the original Interbay note and deed. Interbay amended its petition to add Sheppard as a party after PSM assigned the Lake Olympia note and deed to him.

Interbay filed its summary judgment motion, seeking a declaration "to confirm [its] superior lien status." In its motion, Interbay contended that it had a "contractual superior lien" and, in the alternative, a "valid equitable lien" or an "equitable contractual superior lien" through "subrogation." It also contended that Lake Olympia had released its lien and, thus, PSM had no lien to assign to Sheppard.

In support of its contractual superior lien argument, Interbay asserted that Kimble had refinanced the original Interbay loan to modify the interest rate and receive cash and, in refinancing the Interbay loan, Interbay had never intended for its superior Interbay lien, arising from the original Interbay note and deed, to become inferior to the Lake Olympia lien. As evidence of its intent, Interbay cited the following language contained in section 11.12 of the Interbay refinanced deed:

SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend, or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Note and Other Security Documents and the performance and discharge of the Other Obligations.

Interbay further asserted that the Interbay refinanced note and deed constituted a "renewal, extension[,] and modification" of the original Interbay note and deed. Also, it was Interbay's intent for its "contractual superior lien to remain in full force and effect as a superior lien by the merging of the two Deeds of Trust." To show its intent, Interbay cited the provision entitled "Prior Lien" contained in the subordinated Lake Olympia deed, which stated,

The [Lake Olympia] lien created by this [Lake Olympia] deed of trust *will be subordinate* to the [Interbay] lien securing payment of [the Interbay] note, and *any renewals, extensions, and modifications thereof,* in the original principal amount of [$357,500], executed by [Kimble], payable to [Interbay].

(Emphasis added). Interbay argued, thus, that Lake Olympia had expressly agreed in the Lake Olympia deed that the Lake Olympia lien would, from the inception, be subordinated to Interbay's lien and that Interbay would maintain a "first superior lien," even after any renewals, extensions, and modifications of the original Interbay note.

Alternatively, in support of its claim to an "equitable contractual superior lien," Interbay asserted that, based on the above

facts, it also maintained, as a matter of law, a superior lien for the same amount through "equitable subrogation." Interbay attached to its summary judgment motion a release signed by Andrew Choy on behalf of Lake Olympia on September 25, 2002, the date of the original closing, which provided that Lake Olympia was releasing its lien.

In his response to Interbay's summary judgment motion and his own cross-summary judgment motion, Sheppard first challenged Interbay's contractual superior lien contention on the ground that the Interbay refinanced note and deed did not contain any language indicating that they were renewals, extensions, or modifications of the original Interbay note and deed. Rather, he asserted that the Interbay refinanced note and deed constituted a "new loan and new mortgage" and that the original Interbay note and deed had been "cancelled." In regard to Interbay's "equitable contractual superior lien" contention, Sheppard asserted that Interbay was not a third party to the transaction and, thus, was not entitled to rely on this claim. Sheppard also argued that Interbay's knowledge of the subordinate Lake Olympia lien and Interbay's "unclean hands" precluded Interbay from seeking equitable subrogation. He asserted that Interbay had allowed Chicago Title, the title company handling the refinancing, to refinance the real property and pay proceeds from the refinancing directly to Kimble without providing any consideration to PSM.[2]

In his cross-summary judgment motion, Sheppard agreed that Interbay had refinanced its original Interbay loan, paid off the original Interbay note with the proceeds from the Interbay refinanced loan, issued a new Interbay refinanced note, and obtained a new Interbay refinanced deed securing payment. However, Sheppard emphasized that because Interbay, as part of the refinancing, had released its original Interbay deed, the Lake Olympia lien, as a result, became the first lien on the real property.

The trial court, in an interlocutory order, granted Interbay's summary judgment motion, ruling that Interbay was entitled to an "equitable first lien" on the real property, and denied Sheppard's cross-summary judgment motion. Interbay then filed another summary judgment motion for damages, which the trial court granted. In its final judgment, the trial court ruled that Interbay was entitled to an "equitable first lien" on the real property in the amount of $407,210.52, which represented the amount of the proceeds

2. In support of this assertion, Sheppard attached to his response and motion an affidavit from Andrew Choy, the former president of Lake Olympia and manager of PSM. Choy testified that at the original September 25, 2002 closing, he had executed a release of the Lake Olympia lien and had delivered this release to PSM "for safe keeping and escrow" to be recorded only upon full payment of the Lake Olympia note. Choy explained that, in April 2004, when Kimble approached Lake Olympia about his efforts to refinance the original Interbay loan and avoid losing his property to foreclosure, Choy agreed to fully release the Lake Olympia lien if PSM was paid $44,000 from the refinancing proceeds. Choy later learned that Kimble's refinancing had been accomplished without any payment to release the Lake Olympia lien. Choy stated that the original Lake Olympia release was never recorded because PSM had never received the agreed upon $44,000. On appeal, Interbay is not asserting that the Lake Olympia lien was released, nor is it challenging Sheppard's arguments that PSM had only agreed to release the Lake Olympia lien if it was paid $44,000 from the refinancing proceeds. Rather, Interbay asks us to simply affirm the judgment on the ground that it "held an equitable first lien" on the real property or the ground that it was "contractually subrogated to the first lien position" on the real property.

from the refinancing used to pay off the outstanding balance of the original Interbay note.[3]

## Standard of Review

To prevail on a summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. TEX.R. CIV. P. 166a(c); *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex.1995). A plaintiff moving for summary judgment on its claim must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell,* 193 S.W.3d 87, 95 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey,* 900 S.W.2d at 341; *Yazdchi v. Bank One, Tex., N.A.,* 177 S.W.3d 399, 404 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary judgment evidence presented by both sides and determine all questions presented and render the judgment that the trial court should have rendered. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 648 (Tex.2004). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in its favor. *Id.* at 549.

## Replacement of Senior Mortgage

In its cross-issue, Interbay contends that the trial court erred in not granting it summary judgment on the ground that it was "contractually subrogated to the first lien position." In response to Interbay's cross-issue, Sheppard asserts that the Interbay refinanced note and deed did not contain language indicating that they were renewals, extensions, or modifications of the original Interbay note and deed. Sheppard further asserts that the Interbay refinanced note and deed "were intended to be a new loan and new mortgage," and Sheppard specifically points to evidence that the two Interbay loans had different loan numbers and different principal amounts, the original Interbay note was paid off in its entirety, Interbay charged a prepayment penalty on the original Interbay loan, Kimble was issued a new title policy in conjunction with the Interbay refinanced deed, and Interbay released the original Interbay lien.

In its summary judgment motion, Interbay sought "to confirm [its] superior lien status," and Interbay referred to the lien it sought from the trial court as a "contractual superior lien."[4] Interbay also referred to the contractual documents as evidence that it had never intended for its superior Interbay lien to become inferior to the Lake Olympia lien. Interbay emphasized that Lake Olympia had expressly agreed

---

3. Interbay agrees that is not entitled to priority for any additional proceeds from the refinancing, including the amounts directly paid to Kimble.

4. Interbay's summary judgment motion presented this as an alternative to a lien arising from principles of equitable subrogation.

that the Lake Olympia lien would be subordinated to Interbay's lien and that Interbay would maintain a "first superior lien," even after any renewals, extensions, and modifications of the original Interbay note. As noted above, the Interbay deed expressly provided security for the obligation in the Interbay note as well as "each obligation contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any party of this [Interbay] Note [and] this Security Instrument [Interbay Deed]." Also, the Lake Olympia deed acknowledged that the Lake Olympia lien would be subordinate to the Interbay lien as well as liens arising from any "renewals, extensions, and modifications" of the Interbay note. When Kimble refinanced his Interbay loan, he signed the "Interbay refinanced note," and, as reflected in the settlement statement, $407,210.52 of the proceeds from the Interbay refinanced loan were used to pay the outstanding balance of the Interbay note.

In considering Interbay's claim to a contractual superior lien on the real property, we find guidance in section 7.3 of the Restatement (Third) of Property (Mortgages), which provides,

> Replacement and Modification of Senior Mortgages: Effect on Intervening Interests
>
> (a) If a senior mortgage is released of record and, as part of the same transaction, is replaced with a new mortgage, the latter mortgage retains the same priority as its predecessor, except
>
> (1) to the extent that any change in the terms of the mortgage or the obligation it secures is materially prejudicial to the holder of a junior interest in the real estate, or
>
> (2) to the extent that one who is protected by the recording act acquires

an interest in the real estate at a time that the senior mortgage is not of record.

RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 7.3 (1997). The comments to section 7.3 explain that "a senior mortgagee that discharges its mortgage of record and records a replacement mortgage does not lose its priority as against the holder of an intervening interest unless that holder suffers material prejudice." RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 7.6 cmt. b (1997). While the "increase in the principal amount will prejudice the holders of junior interests," a replacement mortgage under section 7.3 retains seniority "except to the extent of" the increase in principal. *See id.* Section 7.3 "aims at resolving those problems in a manner that protects the legitimate expectations of the holders of junior interests, while at the same time denying them the ability to veto workouts or other flexible restructuring arrangements between mortgagors and senior lenders." RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 7.6 cmt. a (1997).

■ Here, Sheppard does not refer us to any evidence that he was prejudiced by Interbay retaining its first lien on the real property in the amount of the balance of the Interbay lien prior to the refinance. We conclude that the summary judgment record before us defeats any claim of prejudice as a matter of law. *See Providence Inst. for Sav. v. Sims,* 441 S.W.2d 516, 520 (Tex.1969) (noting that "there [was] no contention" that intervening mechanic's lienholder "was placed in a worse position" by lender who sought equitable subrogation after furnishing funds to retire portion of debt secured by first lien on property); *see also Murray v. Cadle,* 257 S.W.3d 291, 300 (Tex.App.-Dallas 2008, pet. denied) (stating that "[a] junior lienholder does not suffer prejudice merely because it is not elevated in priority"); *Farm Credit Bank of Tex. v. Ogden,* 886 S.W.2d 305, 311 (Tex.App.-Houston [1st Dist.] 1994, no

pet.) (stating that equitable subrogation does not prejudice junior lienholder if it leaves him in same position on date lienholder recorded its interest). We also note that nothing in the trial court's judgment implies in any way that the Lake Olympia lien has been released. In fact, on appeal, Interbay has dropped this assertion, instead seeking to establish its priority over the Lake Olympia lien. The trial court, in its judgment, consistent with the principles articulated in section 7.3 of the Restatement, only granted Interbay a first lien as to the amounts paid from the refinancing proceeds to discharge the original Interbay note, not on any other amounts, including the amounts for the cash proceeds paid to Kimble.[5] Based upon the contractual documents, and applying the principles set forth in section 7.3, we hold that Interbay was entitled to maintain a first lien on the real property in the amount of $407,210.52, which represents the balance of the first lien prior to the refinance.[6]

Finally, we note that section 7.3 expressly contemplates that the first mortgage at tion 7.3 or as equitable subrogation under 7.6 is without significant consequence. *See* RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 7.6 cmt. e (1997) (comparing section 7.3, which addresses replacement and modification of senior mortgages, with section 7.6, which addresses subrogation, and stating that requirements of these sections are "essentially similar" and that "results" reached under these are "analagous").

We also note that Texas courts have "long recognized a lienholder's common law right to equitable subrogation." *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618–19 (Tex.2007) (recognizing lender's equitable subrogation rights under common law and holding that lender was equitably subrogated to prior lienholders' interest and, thus, could pursue recovery "for the refinance portion of the loan proceeds" that were used to pay purchase-money and tax liens on homestead property); *see also Benchmark Bank v. Crowder*, 919 S.W.2d 657, 661 (Tex.1996) (holding that bank that loaned money to homeowners to pay federal taxes was equitably subrogated to federal tax liens against property and stating that "[o]nce valid, the lien [did] not become invalid against the homestead simply because the original debt [had] been refinanced").

We further note that the Texas Supreme Court has explained the benefits of equitable subrogation as applied in the context of a refinancing transaction, noting that equitable subrogation permits property owners "to renew, rearrange, and readjust [an] encumbering obligation to prevent a loss" through foreclosure. *Benchmark Bank*, 919

---

5. Although section 7.6 of the Restatement (Third) of Property (Mortgages) deals with equitable subrogation, the comments to this section provide guidance in the situation of a refinancing lender who lends funds exceeding the amount of the preexisting mortgage. *See* RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 7.6 cmt. e (1997) (emphasis added). The comments provide,

> Subrogation will be recognized only if it will *not materially prejudice the holders of intervening interests*. The most obvious illustration is that of a payor who lends the mortgagor more money than is necessary to discharge the preexisting mortgage. *The payor is subrogated only to the extent that the funds disbursed are actually applied toward payment of the prior lien. There is no right of subrogation with respect to any excess funds.*
>
> *Id.* (emphasis added).

6. In light of our holding, we need not reach Sheppard's two issues, in which he argues that the trial court erred in granting Interbay summary judgment on the ground that Interbay was entitled to an equitable lien on the real property and in denying his cross-summary judgment motion because (1) Interbay is not a third party and its knowledge of the prior Lake Olympia lien, as well as Interbay's unclean hands, precluded the application of equitable subrogation, and (2) even if Interbay was entitled to subrogation, Interbay had released its rights to a lien on the real property. However, we note that the Restatement suggests that whether Interbay's claim is properly characterized as a replacement or modification of a prior mortgage under sec-

issue will be released of record and, as part of the same transaction, will be replaced with a new mortgage. RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 7.3 (1997). Thus, Sheppard's assertions that the two Interbay loans had different loan numbers and different principal amounts, the original Interbay note was paid off in its entirety, Interbay charged a prepayment penalty on the original Interbay loan, Kimble was issued a new title policy in conjunction with the Interbay refinanced deed, and Interbay released the original Interbay lien are unavailing.

We sustain Interbay's first cross-issue.

## Conclusion

We modify the judgment of the trial court to delete all uses of the word "equitable" when referring to the first lien held by Interbay on the real property, and, as modified, we affirm the judgment of the trial court.

S.W.2d at 661 (explaining benefits of applying equitable subrogation in context of refinancing transaction involving homestead property); *LaSalle Bank Nat'l Ass'n*, 246 S.W.3d at 620 (stating that "[w]ithout equitable subrogation, lenders would be hesitant to refinance [ ] property due to increased risk that they might be forced to forfeit their liens"); *see also Diversified Mortgage Investors v. Lloyd D. Blaylock Gen. Contractor, Inc.*, 576 S.W.2d 794, 807 (Tex. 1978) (recognizing importance of equitable subrogation to lenders in Texas because doctrine "serves to protect a lienholder from intervening liens, at least to the amount of the initial lien, when the lienholder has discharged a prior superior lien"); *Faires v. Cockrill*, 88 Tex. 428, 437, 31 S.W. 190, 194 (1895) (stating that "[p]erhaps the courts of no state have gone further in applying the doctrine of subrogation than has the court of this state" and that "[o]ne who discharges the vendor's lien upon lands,—even the homestead,—either by paying as surety, or at the request of the debtor, or at a judicial sale, which, for irregularities in the process, fails to convey the title, is entitled to be subrogated to the lien of the creditor to the extent of the payment so made"). Moreover, Texas courts have generally indicated that a refinancing lender's knowledge of a subordinate lien does not automatically defeat a claim for subrogation. *See Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 520 (Tex. 1969) (holding that, under circumstances presented in that case, "neither actual nor constructive knowledge of the intervening lien [would] defeat the right of subrogation to which the debtor agreed ...").

Finally, we note that a recent, thorough opinion from the Supreme Court of Washington surveying equitable subrogation cases from around the country has characterized Texas as one of several jurisdictions to have followed the more liberal Restatement approach on equitable subrogation, which considers "actual or constructive knowledge of intervening interests [to be] irrelevant." *Bank of America, N.A. v. Prestance Corp.*, [160 Wash.2d 560] 160 P.3d 17, 21, 25 (2007) (citing *Farm Credit Bank of Tex. v. Ogden*, 886 S.W.2d 305, 311 (Tex. App.-Houston [1st Dist.] 1994, no pet.); *Chicago Title Ins. Co. v. Lawrence Invs., Inc.*, 782 S.W.2d 332, 334 (Tex.App.-Fort Worth 1989, writ ref'd)); *see also* RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 7.6 cmt. e (1997) ("[S]ubrogation can be granted even if the payor had actual knowledge of the intervening interest.... The question in such cases is whether the payor reasonably expected to get security with a priority equal to the mortgage being paid."). As explained by the court in *Bank of America*, a rule that would preclude equitable subrogation simply because a refinancing lender has knowledge of prior or intervening liens would defeat the availability of equitable subrogation in many refinancing transactions. *Bank of America, N.A.*, 160 P.3d at 22 (stating that such rule would "render[ ] equitable subrogation nearly useless since a refinancing mortgagee will almost always have either actual or constructive knowledge of junior lienholders").